1

2

3

4

5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8   DAVID MICHAEL GRAVES,                    No. C 01-3502 SI (pr)

9              Petitioner,                   **ORDER DENYING SECOND AND
                                             THIRD AMENDED PETITIONS FOR
10       v.                                  WRIT OF HABEAS CORPUS**

11  THOMAS CAREY, warden,

12             Respondent.
                                        /
13  ————————————————————

14                            **INTRODUCTION**

15          This matter is now before the court for consideration of the merits of the fifteen remaining

16  claims in David Michael Graves' second amended and third amended petitions for writ of habeas

17  corpus.  For the reasons discussed below, the petitions will be denied.

18

19                            **BACKGROUND**

20          David Michael Graves was convicted of the murder of Gary Tutt and the attempted

21  murder of Daniel McKinzie.  The crimes were charged in a single information, then severed for

22  trial.  First, Graves was tried for the attempted murder and convicted, but the jury did not reach

23  a verdict on the allegation that it was willful, deliberate and premeditated.  Next, Graves was

24  tried for the murder and convicted.  Finally, he had a retrial on the issue of whether the attempted

25  murder was willful, deliberate and premeditated, with the jury finding that it was.  The crimes

26  on which the convictions were based were described in the court's August 9, 2006 Order

27  Denying Petition For Writ Of Habeas Corpus And Granting in part Petitioner's Motion To File

28  Third Amended Petition, filed at docket # 89 (the "August 9, 2006 order"), and are repeated here

United States District Court
For the Northern District of California

for convenience:

A.    Attempted Murder Conviction

Petitioner's attempted murder conviction arose from a knife fight he had with Daniel McKinzie in front of McKinzie's Walnut Creek home at approximately 7 a.m. on October 11, 1994.  During the fight, petitioner was stabbed twice in the stomach, while McKinzie suffered nine knife wounds, including a deep stab wound to the front of his torso and two serious stab wounds to his upper back.  There were no witnesses to the beginning of the fight, although two of McKinzie's neighbors witnessed its end.

At trial, the parties presented dramatically different versions of how the fight began.  According to the prosecution, petitioner hid on the side of McKinzie's house on the morning of October 11.  When McKinzie left for work that morning, petitioner attacked him from behind with a knife, stabbing him numerous times before McKinzie was able to react.  McKinzie called for help, and was able to fight petitioner off until his neighbors responded to his cries.  In the process, McKinzie put petitioner in a headlock, drew his own knife, and stabbed petitioner twice in the stomach.  Once the fight was broken up, petitioner ran off.  Despite profuse bleeding, petitioner drove to a hospital in Martinez, rather than to a nearer hospital in Walnut Creek.  At the hospital, he told police that he had been assaulted by two black men who tried to rob him.  Petitioner's knife was later found on the roof of a building near McKinzie's home.

In his defense, petitioner claimed that the fight had actually been initiated by McKinzie, and that he had only drawn his knife in self defense.  Petitioner testified that McKinzie had attacked him because McKinzie was angry that petitioner had spent the night with his ex-girlfriend Cindy a few years earlier.  According to petitioner, he stopped by McKinzie's house on the way to work and waited for him on the sidewalk.  When McKinzie emerged, he saw petitioner and said "What the fuck are you doing here?"  When petitioner mentioned Cindy's name, McKinzie started punching him and throwing him around.  At some point, McKinzie placed petitioner in a headlock and stabbed him twice.  At that point, petitioner freed himself from the headlock, took out his own knife, and "started going back on him with mine."

Respondent Exh. 4 at 3.  Once the fight was broken up, petitioner fled the area and drove to a hospital in Martinez.  He claimed that he drove to Martinez and lied to the police because he was afraid of getting in trouble.

Petitioner was convicted of attempted murder after two trials.  The first jury found that he was guilty of attempted murder but was unable to determine if the attempted murder had been "willful, deliberate, and premeditated."  *See* Cal. Penal Code § 189 (defining first degree murder); Cal Penal Code § 664 (prescribing punishments for attempt crimes).  Petitioner was then retried only on the premeditation allegation, which the second jury found to be present.

B.   Murder Conviction

Petitioner's murder conviction arose from the death of Gary Tutt, who was shot to death on the front porch of Robert Howe's Walnut Creek home at approximately 11 a.m. on October 2, 1994.  At trial, the prosecution introduced evidence showing that Graves held a grudge against Tutt.  Graves and his ex-girlfriend, Kim Bates, had gotten in a fight because Graves believed she was cheating on him with Tutt.  According to the prosecution witnesses, Graves arrived at Howe's property with Donnie Shivel, Phil Stott, Lisa Nash, and Nash's one-year-old son shortly before Tutt was shot.  Graves and Shivel entered the home while Stott, Nash, and her child stayed on the deck, where Tutt was sitting in a chair.  At some point Graves walked out on to the deck.  Although no one admitted to witnessing Graves shoot Tutt, Tutt was shot twice in the neck shortly after Graves left the house.  Stott testified that after Tutt was shot, he went to his car and found Graves sitting in his car with a gun.  Shivel testified that he had given Graves a .357 Magnum – which was consistent with the murder weapon – that morning, because Shivel was scared of violating his probation.

Petitioner's primary defense was that a person named Scott Casteel had committed the murder.  According to defense witness William Barnhard, Casteel had confessed to him that he killed Tutt.  Casteel's description of the murder, however, was inconsistent with a number of facts.  Specifically, Barnhard testified that Casteel confessed to shooting Tutt through a pillow,

United States District Court
For the Northern District of California

in a bedroom, and that Tutt was Caucasian.  According to Barnhard, Casteel had also told him that John Hinkley – often referred to as David Hinkley in petitioner's briefs – was present when Tutt was killed.  Graves called Hinkley to the stand, but Hinkley refused to testify, asserting his Fifth Amendment privilege against self incrimination.  Petitioner alleges that the prosecutor threatened to charge Hinkley with Tutt's murder if he testified at petitioner's trial.

C.    Procedural History

The end result of the trials was that Graves was convicted of murder and attempted premeditated, willful and deliberate murder.  He was sentenced to imprisonment for 29 years to life followed by a life term.  He appealed.  The California Court of Appeal affirmed in a reasoned decision on January 22, 1999.  The California Supreme Court denied his petition for review on May 12, 1999.  Graves filed several state habeas petitions before filing this action.

As a result of various motions, amendments and orders, the operative pleadings are the second amended petition plus one claim in the third amended petition that was allowed to proceed.  The claims are listed below:

Claims Arising out of Attempted Murder Conviction.

Claim 1:  The trial court violated petitioner's due process rights by accepting a verdict on the attempted murder charge in the first attempted murder trial despite the jury's inability to agree on whether the attempted murder was "willful, deliberate, and premeditated."

Claim 2:  The trial court violated petitioner's due process rights by failing to sua sponte instruct the jury on imperfect self-defense.

Claim 3:  The trial court violated petitioner's due process rights by instructing the jury on the limitations of self-defense.

Claim 4:  Counsel at the first attempted murder trial failed to investigate and present evidence on self-defense or imperfect self-defense.

Claim 5:  Counsel at the first attempted murder trial failed to request a jury instruction on imperfect self-defense.

Claim 6:  Counsel at the second attempted murder trial failed to object that it was improper for Graves to be re-tried only on whether the murder attempt was willful, deliberate, and premeditated instead of being re-tried on the entire charge.

Claim 7:  Appellate counsel failed to contend that it was improper for Graves to be re-tried on whether the murder attempt was willful, deliberate, and premeditated.

Claim 8:  Appellate counsel failed to contend that counsel in the first trial was ineffective for failing to investigate and present evidence on self-defense.

Claim 9:  Appellate counsel failed to contend that trial counsel was ineffective for failing to object to the retrial of the premeditation charge.

Claim 10:  Appellate counsel failed to contend that the trial court's instruction on the limitations of self-defense violated due process.

Claim 11:  Appellate counsel failed to contend that trial counsel was ineffective for failing to request an imperfect self-defense instruction.

Claim 12:  Appellate counsel failed to contend that the trial court's failure to instruct on imperfect self-defense sua sponte constituted a due process violation.

Claims Arising out of Murder Conviction

Claim 13: The trial court violated petitioner's due process rights by failing to adequately examine a key defense witness about his invocation of his Fifth Amendment privilege against self-incrimination.

Claim 14: The trial court violated petitioner's due process rights by giving an improper implied malice instruction.

Claim 15: Trial counsel failed to object to the court's implied malice instruction.

Claim 16: Trial counsel failed to request an instruction on third-party liability.

Claim 17: Appellate counsel failed to argue that the trial court gave an improper  implied malice instruction.

Claim 18:  Appellate counsel failed to argue that the trial court should have sua sponte instructed on third-party liability.

1    Claim 19: Appellate counsel failed to argue that the trial court inadequately examined a

2  key defense witness about his refusal to testify based upon his Fifth Amendment privilege

3  against self-incrimination.

4    Claim 20: Prosecutorial misconduct (as alleged at pages 40-42 of the Third Amended

5  Petition).

6    Several claims were adjudicated on the merits and will not be revisited.  Claims 1, 4, 6,

7  8, and 9 were denied on the merits in the August 9, 2006 order.  This order addresses the merits

8  of the remaining claims.

9

10              **JURISDICTION AND VENUE**

11    This court has subject matter jurisdiction over the petition for writ of habeas corpus under

12  28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

13  conviction occurred in Contra Costa County, within this judicial district.  28 U.S.C. §§ 84,

14  2241(d).

15

16                  **EXHAUSTION**

17    Prisoners in state custody who wish to challenge collaterally in federal habeas

18  proceedings either the fact or length of their confinement are required first to exhaust state

19  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

20  highest state court available with a fair opportunity to rule on the merits of each and every claim

21  they seek to raise in federal court.  28 U.S.C. § 2254(b), (c).  The court may deny, but not grant,

22  relief on an unexhausted claim.

23

24              **STANDARD OF REVIEW**

25    This court may entertain a petition for writ of habeas corpus "in behalf of a person in

26  custody pursuant to the judgment of a State court only on the ground that he is in custody in

27  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

28

**United States District Court**
For the Northern District of California

petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

## DISCUSSION

I.     **Claims Regarding Attempted Murder Conviction**.

A.     Claim 2: The trial court violated petitioner's due process rights
       by failing to sua sponte instruct the jury on imperfect self-defense.

Graves contends that his right to due process was violated because the trial court did not sua sponte instruct on imperfect self defense.  He argues that "the evidence supported this theory, and the theory was not inconsistent with any other defense."  Second Amended Petition ("SAP"), p. 21.  He does not, however, explain how the evidence supported this theory.

California recognizes the defense of "imperfect self-defense" to the charge of murder or

7

attempted murder.  "'An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.'"  In Re Christian S., 7 Cal. 4th 768, 773 (Cal. 1994), quoting People v. Flannel, 25 Cal. 3d 668, 674 (Cal. 1979); see also People v. Szadziewicz, 161 Cal. App. 4th 823, 834 (Cal. Ct. App. 2008), (imperfect self-defense makes what would otherwise be an attempted murder an attempted manslaughter).

Graves' federal due process claim based on the failure to instruct on imperfect self-defense fails because there is no clearly established federal rule that a trial court must instruct on all lesser included and lesser related offenses.  Although instructions on lesser included offenses must be given in capital cases, Beck v. Alabama, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether Beck applies to noncapital cases such as the present one.  In fact, this circuit, without specifically addressing the issue of extending Beck, has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case."  Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).  The failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000); Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998).  As respondent notes, imperfect self-defense is not a full defense, but would reduce the crime to a lesser crime.  Graves had no due process right to instructions on lesser-included offenses, such as an imperfect self-defense instruction essentially would be, as imperfect self-defense would reduce the legal consequence of the acts from attempted murder to attempted manslaughter.

Even though there is not a constitutional right to lesser included and lesser related instructions, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule."  Solis, 219 F.3d at 929.  Solis suggests that there must be substantial evidence to warrant the instruction on the lesser included

United States District Court
For the Northern District of California

1    offense.  See id. at 929-30 (no duty to instruct on involuntary manslaughter because evidence

2    presented at trial implied malice); see also Cooper v. Calderon, 255 F.3d 1104, 1110-11 (9th Cir.

3    2001) (no duty in death penalty case to instruct on second degree murder as a lesser included

4    offense because the evidence established that the killer had acted with premeditation, so if the

5    jury found that the defendant was the killer, it necessarily would have found that he committed

6    first degree murder).  This exception is inapplicable here because Graves presented no evidence

7    during the trial regarding imperfect self-defense instead of self-defense.  The defense theory was

8    that Graves had an actual and reasonable need to defend himself from an attack by McKinzie,

9    and not that he was acting under any sort of mistaken or unreasonable belief in a need to defend

10   himself. Graves even personally waived instructions on attempted manslaughter.  Resp. Exh. 1,

11   RT 546. Graves' testimony was that McKinzie attacked him and stabbed him before he took

12   action to stop the attack. Resp. Exh. 1, RT 447-53.[1]  The only other witness to the beginning of

13   the fight was McKinzie, and his testimony was that he (McKinzie) was subjected to a surprise

14   attack by Graves.  The three additional witnesses who testified at the retrial also did not give any

15   testimony that would have provided an evidentiary basis for imperfect self-defense.[2]

16          The jury had two stories to choose from: either Graves started the stabbing or McKinzie

17   started the stabbing, and neither story reflected that Graves acted with an unreasonable belief in

18   a need to defend himself.  Since there was no evidentiary support and imperfect self-defense was

19   not the defense theory, an instruction was not required.  Graves is not entitled to the writ on his

20   claim that the trial court should have given an imperfect self-defense instruction.

21

22

23          [1]Graves' testimony in the retrial on the premeditation/deliberation issues also indicated
     that McKinzie attacked and stabbed him before he acted in defense. Resp. Exh. 3, RT 499-505.
24
            [2]Those witnesses were Richard Kirkpatrick, Stephen Pittel, and Lawrence Elson. See Cal.
25   Ct. App. Opinion, p. 4.  Kirkpatrick testified that McKinzie injected methamphetamine the night
     before the incident.  Id.  Defense psychologist Pittel testified about the effect of drugs on the
26   human body, psychological responses, and physical responses, and gave opinions about
     McKinzie's and Graves' behaviors.  Id.  Anatomist Elson opined that the injuries suffered by the
27   parties were consistent with Graves' testimony and not McKinzie's.  Id. at 5.  Their testimony,
     if believed, would at most make it less likely that McKinzie's version of the episode was true,
28   but that would have supported self-defense, not imperfect self-defense.

B.    Claim 3: The trial court violated petitioner's due process rights
      by instructing the jury on the limitations of self-defense.

The jury instructions at Graves' retrial included the following:

The right of self-defense exists only as long as the real or apparent threat or danger
continues to exist.  When such danger ceases to appear to exist, the right to use force in
self-defense ends. [¶] The right of self-defense ceases to exist when there is no longer an
apparent danger of further violence on the part of an assailant.  Thus, where a person is
attacked under circumstances which justify the exercise of the right of self-defense, and
thereafter, such person uses such force upon his attacker as to render the attacker
apparently incapable of inflicting further injuries, the right to use force in self-defense
ends.

Resp. Exh. 3, RT 720-721; see CALJIC 5.52, 5.53.

Graves contends that the trial court violated his right to due process by giving this

instruction that the right of self-defense lasts only as long as the real or apparent danger exists.

Graves does not argue the instruction was legally incorrect.   Rather, he argues that the

instruction was improper because McKinzie and Graves both claimed that the other man was the

aggressor in the fight and "at no time was there sufficient evidence to support the instruction

given because there was no evidence to show that 'there [was] no longer an apparent danger of

further violence on the part of an assailant.'" SAP, p. 23.

The trial court explained that the instruction would be given because there was testimony

from a medical expert "that if the victim suffered a wound collapsing his lung, he would have

trouble breathing as he would be operating on less than two fully operable lungs and a person

like this would start to flag and run out of gas. [¶]   That testimony is sufficient . . . for the jury

reasonably to draw a conclusion that the attacker of the defendant was rendered incapable or

apparently incapable of inflicting further injuries which would terminate the right to use force

in self-defense."  Resp. Exh. 3, RT 698.

To obtain federal habeas relief, Graves must show that an instructional error was

committed and that such error, by itself, so infected the entire trial that the resulting conviction

violated due process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  Furthermore, even if the

instruction was erroneous, relief would only be available if it had a "substantial and injurious

effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637

United States District Court
For the Northern District of California

(1993).

Graves comes nowhere near to making the showing necessary for habeas relief.  He has not shown that the instruction incorrectly stated the law.  Giving a correct statement of state law does not make a trial fundamentally unfair.  Even if, as he argues, no evidence showed the scenario contemplated by the instruction to have existed, the instruction would be mere surplusage.  The jury instructions given included the standard one that not all instructions may apply and the jurors were to "[d]isregard any instruction which applies to facts determined by [the jurors] not to exist."  Resp. Exh. 3, RT 850; see CALJIC 17.31.  The jury is presumed to have followed the instructions and this is not a case where that presumption should be ignored. See Francis v. Franklin, 471 U.S. 307, 324-25 n.9 (1985).  The use of the instruction on the limits of self-defense did not result in a due process violation.

C.    Claim 5: Counsel at the first attempted murder trial
       failed to request a jury instruction on imperfect self-defense.

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Graves must establish two things.  First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  The relevant inquiry under Strickland is not what defense counsel could have done, but rather whether his choices were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).  A lawyer need not file a motion or make an objection that he knows to be meritless on the facts and

the law.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999); Rupe v. Wood, 93 F.3d 1434,

1445 (9th Cir. 1996) (failure to take futile action is not deficient performance).

Graves contends that trial counsel was deficient in not requesting a jury instruction on

imperfect self-defense.  Because such an instruction was not appropriate for the reasons

discussed in Section A (Claim 2) above, Graves' ineffective assistance claim fails on both prongs

of the Strickland test.  That is, it was not deficient performance to not seek an instruction that

was not supported by the evidence and was not the theory of the defense, and no prejudice

resulted from the failure to seek the inapplicable instruction.


D.      Claim 7: Appellate counsel failed to contend that it was improper for Graves
        to be re-tried on whether the murder attempt was willful, deliberate, and premeditated.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

the effective assistance of counsel on his first appeal as of right.  See Evitts v. Lucey, 469 U.S.

387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed

according to the Strickland standard discussed in the preceding section.  A defendant therefore

must show that counsel's advice fell below an objective standard of reasonableness and that there

is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed

on appeal.  Miller v. Keeney, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989) (citations omitted).

Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested

by a defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker

issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller,

882 F.2d at 1434.  Appellate counsel therefore will frequently remain above an objective

standard of competence and have caused his client no prejudice for the same reason–because he

declined to raise a weak issue.  Id.

Graves contends in this claim that his appellate counsel was ineffective in not arguing that

it was improper for Graves to be re-tried on whether the attempted murder was willful, deliberate

and premeditated.  The ineffective assistance claim fails because the underlying claim has no

merit for the reasons explained in the August 9, 2006 order.  This court rejected the claim that

Graves' right to due process was violated when the court accepted a verdict on the attempted murder charge in the first attempted murder trial despite the jury's inability to agree whether the attempted murder was willful, deliberate and premeditated.  August 9, 2006 order, pp. 8-11. This court also rejected the claim that trial counsel at the re-trial was ineffective in failing to argue that Graves should have been retried on the entire charge, rather than just the issue of premeditation. Id. at 16-17.  In rejecting those claims, this court explained that the right to have a jury determine Graves' guilt of all elements of the offense was fully accommodated by the trial court because the state law then in place was that the allegation that the attempt was willful, deliberate and premeditated was a penalty provision and not an element of attempted murder. At the time Graves was convicted of attempted murder the California Supreme Court had clearly approved the procedure of retrying whether an attempted murder was willful, deliberate, or premeditated. See People v. Bright, 12 Cal. 4th 652, 656-57 (Cal. 1996).  Appellate counsel did not engage in deficient performance in not arguing the claim that was not meritorious.  There also was no prejudice resulting from not arguing the claim that was not meritorious.

E.     Claim 10: Appellate counsel failed to contend that the trial court's
        instruction on the limitations of self-defense violated due process.

        Graves contends appellate counsel was deficient in not arguing that the instruction on the limits of self-defense violated his right to due process.  For the reasons discussed in Section B (Claim 3) above, there is no merit to the contention that the instruction on the limits of self-defense violated due process.  The claim that appellate counsel was ineffective fails on both prongs of the Strickland test.  That is, it was not deficient performance to not argue a meritless claim and no prejudice resulted from not arguing a meritless claim.

F.     Claim 11: Appellate counsel failed to contend that trial counsel
        was ineffective for failing to request an imperfect self-defense instruction.

        Graves contends that appellate counsel was ineffective in not arguing that trial counsel was ineffective in not requesting a jury instruction on imperfect self-defense.  Because such an

United States District Court
For the Northern District of California

instruction was not appropriate for the reasons discussed in Section A (Claim 2) above, and because trial counsel was not ineffective in not requesting the inapplicable instruction for the reasons discussed in Section C (Claim 5), above, the claim that appellate counsel was ineffective fails on both prongs of the <u>Strickland</u> test.  That is, it was not deficient performance to not argue a meritless claim and no prejudice resulted from not arguing a meritless claim.

G.     Claim 12: Appellate counsel failed to contend that the trial court's failure
       <u>to instruct on imperfect self-defense sua sponte constituted a due process violation.</u>

Graves contends appellate counsel was deficient in not arguing that the failure to <u>sua sponte</u> instruct on imperfect self-defense violated his right to due process.  For the reasons discussed in Section A (Claim 2) above, there is no merit to the contention that the instruction should have been used.  The claim that appellate counsel was ineffective fails on both prongs of the <u>Strickland</u> test.  That is, it was not deficient performance to not argue a meritless claim and no prejudice resulted from not arguing a meritless claim.

## II     **Claims Regarding Murder Conviction**

H.     Claim 13: The trial court violated petitioner's due process rights by failing
       to adequately examine a key defense witness about his invocation of his
       Fifth Amendment privilege against self-incrimination.

At Graves' trial, the defense wanted to call John Hinkley as a witness.  Hinkley, upon the advice of attorney Ken Dothee, invoked his Fifth Amendment privilege against self-incrimination.  Graves now contends that the trial court failed to adequately investigate the basis of that invocation before excusing Hinkley from the duty to testify.  He contends that the trial court wrongly refused to allow the defense to ask specific questions of Hinkley before the court accepted that the witness would not testify.

The California Court of Appeal described the colloquy that took place in the trial court outside the presence of the jury:

> Hinkley stated that he intended to invoke the privilege to all questions related to the murder.  Defense counsel asked the court to conduct an in camera inquiry of the basis and validity of Hinkley's assertion of the privilege.  The prosecutor responded that appellant's

14

**United States District Court**
For the Northern District of California

defense was that he did not commit the murder, and that Barnhard testified that Casteel said Hinkley was at the scene.  The court indicated that it appeared that Hinkley and his counsel were asserting the Fifth Amendment privilege in good faith to protect Hinkley's interests.  Defense counsel again asked the court to determine the basis for Hinkley's Fifth Amendment assertion. [¶]   The prosecutor made an offer of proof that Hinkley was at an apartment with Shannon Grubbs prior to going to the murder scene. [¶] In camera, Hinkley's attorney stated that there "apparently was some evidence that Hinkley was present at the scene of the murder, and that the defense theory was that appellant did not commit the crime, thereby exposing those at the scene to potential liability."  The court found Hinkley's assertion of the Fifth Amendment privilege was in good faith. [¶] Thereafter appellant referred to a police "investigation report" that said Casteel told Hinkley that Casteel killed Tutt and that Casteel "cried on [Hinkley's] shoulder because [Hinkley] . . . is somebody who could understand that [because Hinkley has] killed two people."  Appellant argued that he was being deprived of a witness, and moved to grant Hinkley immunity or compel the prosecutor to do so.  The court denied the motions on the ground that it had no power to grant immunity.

Cal. Ct. App. Opinion, pp. 10-11; see Resp. Exh. 2, RT 1092-1109.  The California Court of Appeal explained that, under state law, the trial court should make a particularized inquiry to determine whether the assertion of the privilege against self-incrimination is well-founded.  Cal. Ct. App. Opinion, p. 11.  The record here "does not reveal that Hinkley made a sufficient showing to permit his assertion of his privilege" but any error in allowing the assertion of the privilege was harmless.  Id.  That court also concluded that it was not error under state or federal law to not grant immunity to Hinkley to get his testimony.  Id. at 11-12.  That court was not asked to decide whether the failure to adequately investigate the witness' invocation of his right not to incriminate himself violated Graves' rights to due process and to present a defense.

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted).  The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness.  Washington v. Texas, 388 U.S. 14, 19 (1967).  This right was held applicable to the states through the Fourteenth Amendment.  See id. at 18-19. The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi,

15

United States District Court
For the Northern District of California

410 U.S. 284, 295 (1973); <u>Taylor v. Illinois</u>, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute).  Thus, the accused's compulsory process right may be limited by discretionary limitations on presentation of defense witnesses by the trial court such as would occur when a witness has invoked the Fifth Amendment or based on routine evidentiary rules. <u>See</u> <u>Arredondo v. Ortiz</u>, 365 F.3d 778, 783-84 (9th Cir. 2004) (upholding trial court's exclusion of defense witness who intended to invoke the Fifth Amendment); <u>cf.</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 42-43 (1996) (defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence; the exclusion of evidence does not violate the Due Process Clause unless it offends some fundamental principle of justice); <u>Perry v. Rushen</u>, 713 F.2d 1447, 1453-54 (9th Cir. 1983) (no violation of compulsory process to prohibit evidence of third party identity because evidence collateral and state interest in evidentiary rule overriding).  Even if the exclusion of evidence was a constitutional error, the erroneous exclusion must have had a "substantial and injurious effect" on the verdict for habeas relief to be granted.  <u>Brecht</u>, 507 U.S. at 623.

The transcript of the proceedings in which Hinkley invoked his privilege against self-incrimination, Resp. Exh. 2, RT 1092-1109, indicates that the trial judge accepted at face value the representations by Hinkley's attorney that Hinkley had self-incrimination concerns and was uncertain whether it was appropriate for the court to inquire any further.  RT 1098.  The root of the problem may have been attorney Ken Dothee's failure to make adequate inquiries of his client before rendering his advice, although the attorney may have downplayed the information he was aware of to protect attorney-client confidences.  Attorney Dothee apparently came to the courtroom at the judge's request to consult with and advise Hinkley about self-incrimination concerns.  RT 1091-92.  Attorney Dothee stated he knew "close to nothing about this case," and had "never seen one page of police reports in this case."  RT 1101.  He stated that he did discuss the case with Hinkley and was aware from the court proceedings that there apparently was evidence or testimony that Hinkley may have been at the scene of the murder and, since the case was a "'who done it'" kind of case, "[t]hat leaves potential liability for the others who were at the

United States District Court
For the Northern District of California

1  scene of the murder in [his] mind."  RT 1101.  This court accepts the state appellate court's

2  finding that the trial court's inquiry into the basis for Hinkley's invocation of his right not to

3  incriminate himself was unacceptably shallow.  Doing so, however, does not help Graves

4  because any error was harmless.

5      Assuming <u>arguendo</u> that Hinkley actually had a bona fide reason to invoke his Fifth

6  Amendment privilege against self-incrimination, the failure of the trial court to inquire more

7  thoroughly was harmless in that the actual basis for Hinkley to invoke his privilege against self-

8  incrimination would have been uncovered by more thorough investigation and he would have

9  been allowed to avoid testifying.  If there was a bona fide reason to invoke the Fifth

10  Amendment, the jury would have heard nothing from the witness.

11      Alternatively, assuming <u>arguendo</u> that Hinkley did not have a bona fide reason to invoke

12  his Fifth Amendment privilege and that the trial court would have realized that if it did a more

13  thorough inquiry, Hinkley would have been required to testify.  His testimony would have been

14  that he was not present at the shooting and could only repeat what he had heard Scott Casteel

15  say.  <u>See</u> Pet. Exhs. L(2) and L(3) filed Sept. 17, 2001.[3]  The problem for Graves is that the jury

16  heard that Casteel confessed from another defense witness and rejected it.  William Barnhard

17  testified that Casteel had confessed to him that he had killed Tutt.  As explained in more detail

18  in Section K (Claim 16), <u>infra</u>, Casteel's confession was not believable because he got so many

19  details of the shooting wrong.  He had been wrong about where on the property the shooting

20  took place, wrong about the time of day of the shooting, wrong about claiming that the victim

21  was shot twice in the head, wrong about a pillow being used between the victim's head and the

22  nose of the gun when the shot was fired, and wrong about the victim's race.  Casteel's detailed

23  _____

24      [3]Hinkley's declaration dated June 5, 1997 stated that he "was aware of certain facts about
   the murder that implicated someone other than David Graves, as the perpetrator of that crime."
25  Pet. Exh. L(1).  In a September 23, 1997 letter to Graves in care of his father, appellate counsel
   wrote that he read Hinkley's declaration with great interest but noted that Hinkley "says nothing
26  about what 'certain facts' he could testify about.  I need to know what he would have said."  Pet.
   Exh. L(3).  Graves' father wrote back to Gee in response to his September 23, 1997 letter: "Mr.
27  Hinkley was going to testify that Scott Casteel cried on his shoulder and told him that (Scott
   Casteel) Killed Gary Tutt, apparently this is on a Taped Interview."  Pet. Exh. L(3) (errors in
28  source).

1   explanation to Barnard of what had happened was so clearly undermined by other testimony and

2   by the physical evidence that his confession would not have been any more believable if a

3   second witness (Hinkley) had come forward and testified that he too heard a confession by

4   Casteel.[4]  Although the alleged confession to Hinkley was perhaps devoid of any of the details

5   that Casteel got wrong when he confessed to Barnhard, the "Casteel did it" defense would not

6   have raised a reasonable doubt.  Graves is not entitled to the writ on this claim.

7

8   I.      Claim 14: The trial court violated petitioner's due process
              rights by giving an improper implied malice instruction.

9

10          Graves contends that the implied malice instruction violated his right to due process

11  because it omitted "a necessary element of the crime, as defined by the state Legislature, that the

12  killing must show an abandoned and malignant heart."  SAP, p. 14, citing Cal. Penal Code § 188

13  (malice "is implied, when no considerable provocation appears, or when the circumstances

14  attending the killing show an abandoned and malignant heart.")

15          At Graves' trial, the jury was instructed that to establish the crime of murder, three

16  elements must be proved: (1) a human being was killed, (2) the killing was unlawful, and (3) the

17  killing was done with malice aforethought.  The court then gave the challenged instruction

18  defining malice:

19          Malice may be express or implied.  Malice is express when there is manifested an
            intention unlawfully to kill a human being. [¶]  Malice is implied when: 1) the killing
20          resulted from an intentional act; 2) the natural consequences of the act are dangerous to
            human life, and; 3) the act was deliberately performed with knowledge of the danger to
21          and with conscious disregard for life.

22  Resp. Exh. 2, RT 1169; see CALJIC 8.11.

23          As mentioned earlier, to obtain federal habeas relief, Graves must show that an

24  instructional error was committed and that such error, by itself, so infected the entire trial that

25  _____

26          [4]The "Casteel did it" defense would not have gained strength with the Hinkley testimony.
    Not only was Casteel's confession as recounted by Barnhard not credible, Hinkley's testimony
27  would have contradicted Barnhard's testimony that Casteel said Hinkley was present at the
    shooting.  And the defense had the additional problem that when Casteel talked to the police, he
28  told the police that he believed Don Shivel killed Tutt, see Exh. K(1) p. 72, and felt that Graves
    was "about to be a fall guy for something he didn't do," id. at 73.

United States District Court
For the Northern District of California

the resulting conviction violated due process.  See Estelle v. McGuire, 502 U.S. at 72.

Furthermore, relief is only available if the instructional error had a "substantial and injurious

effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

Graves has not pointed to a particular infirmity in the instruction, other than that its

language does not track that of the statute.  The variation between the statutory language and the

instruction simply is not enough to show that the instruction was erroneous.  Indeed, the

California Supreme Court has approved the instruction as a correct statement of California law

and guided courts away from use of the exact phrase Graves complains was not used because

it was too susceptible to misunderstanding.

> Translation of the statutory elements of implied malice into plain, understandable jury
> instructions has undergone an evolutionary process. . . . Initially, the controlling decisions
> upheld a jury instruction that relied on the statutory definition of implied malice,
> permitting the jury to find malice if the killing were done with "an abandoned and
> malignant heart." . . . Subsequent decisions determined, however, that such an instruction
> was too cryptic. . . .  In People v. Phillips, [64 Cal.2d 574, 587 (Cal. 1966)], we observed
> that an instruction which relies on the term "abandoned and malignant heart" invites
> confusion and unguided speculation, for it "could lead the jury to equate the malignant
> heart with an evil disposition or a despicable character; the jury, then, in a close case,
> may convict because it believes the defendant a 'bad man.'"

People v. Nieto Benitez, 4 Cal. 4th 91, 103 (Cal. 1992) (citations omitted); see also id. at 104

(the better practice in the future is to charge juries solely in the "conscious disregard for human

life" definition of implied malice rather than using that language plus the alternative of language

that finds malice in the doing of an act that involves a high probability that it will result in

death).   Although Nieto Benitez dealt with an earlier version of CALJIC 8.31, the language

paralleled the version of CALJIC 8.11 given at Graves' trial.

The California Supreme Court's interpretation of California law and implicit

determination that the definition of implied malice as stated in CALJIC 8.11 reflects California

law is a state law determination that is binding in this federal habeas action.  See Hicks v.

Feiock, 485 U.S. 624, 629-30 (1988).  That is, this court's analysis begins with an acceptance

that implied malice exists in California "when a person does an act, the natural consequences of

which are dangerous to life, which act was deliberately performed by a person who knows that

his conduct endangers the life of another and who acts with conscious disregard for life."  Nieto

19

Benitez, 4 Cal. 4th at 104 (quoting People v. Watson, 30 Cal. 3d 290, 300 (Cal. 1981)).  The jury instruction in this action, which correctly reflected California law (even if it did not track the statute's particular phrasing) did not violate due process.

Further, even if there was instructional error in not tracking the statutory language on implied malice, Graves has not shown that it had a substantial and injurious effect on the jury's verdict.  As the California Supreme Court noted in Nieto Benitez, the "abandoned and malignant heart" language had fallen out of favor because it invited confusion and led to the possibility of a conviction based on a defendant's bad character rather than his acts.  Graves has not explained how the failure to give the confusing instruction affected the verdict in his case.   Finally, Graves' mental state was not a central issue – his defense was that the prosecution had not proved that he was the person who killed the victim.  The manner of killing also made it most improbable that the language in the definition of implied malice played a pivotal role in the jury's deliberations: the victim was shot with a large caliber weapon at close range once in the upper chest and once in the back of the head.  Cal. Ct. App. Opinion, p. 5.  Graves is not entitled to the writ on this claim.

J.      Claim 15: Trial counsel failed to object to the court's implied malice instruction.

Graves contends that trial counsel was deficient in not objecting to the implied malice instruction. For the reasons discussed in Section I (Claim 14) above, there is no merit to the contention that the instruction was infirm.  The claim that trial counsel was ineffective fails on both prongs of the Strickland test.  That is, it was not deficient performance to not raise a meritless objection and no prejudice resulted from not raising a meritless objection.

K.      Claim 16: Trial counsel failed to request an instruction on third-party liability.

Graves argues that trial counsel was ineffective in failing to request an instruction on third party liability because his theory of defense was that Scott Casteel, rather than Graves, was the shooter.  The evidence with regard to Scott Casteel came from defense witness William

United States District Court
For the Northern District of California

1  Barnhard, who claimed that Casteel had confessed to him shortly after the killing.  His testimony

2  was described by the California Court of Appeal:

> Defense witness William Barnhard, currently serving a 35-years-to-life sentence for
> carjacking, testified that Scott Casteel confessed to killing Tutt.  Barnhard said Casteel
> told him he had heard that Tutt testified against a Gene Boyles in a murder case.  Casteel,
> Shivel and "Shannon" "ran across" Tutt at a house in Walnut Creek and Casteel shot Tutt
> through a pillow, the murder occurred in the bedroom, and John Hinkley was present
> during the murder.  Barnard said he talked to the police hoping for leniency in his own
> case.  He admitted that after talking to the police he met [Graves] in jail, and that they are
> housed in the same module.  On cross-examination Barnhard admitted that he presently
> has a vendetta against Casteel for threatening  his life, harassing his family and killing
> his dog in front of his young child.
>
> In rebuttal [Detective] Fuqua testified that Barnhard told him Casteel confessed
> to the murder, but Fuqua did not find Barnhard's story credible.

10  Cal. Ct. App. Opinion, p. 7.

11      The claim that trial counsel was deficient in failing to request a third party liability

12  instruction fails on both prongs of the <u>Strickland</u> analysis.  The failure to request the third party

13  liability instruction was neither deficient performance and nor prejudicial for basically the same

14  reason: the third party liability instruction does virtually nothing to help the defendant and the

15  relevant principle is covered in the reasonable doubt instruction.

16      The pattern third party liability instruction provides: "There has been evidence in this case

17  indicating that a person other than defendant was or may have been involved in the crime for

18  which the defendant is on trial. [¶] There may be many reasons why that person is not here on

19  trial. Therefore, do not discuss or give any consideration as to why the other person is not being

20  prosecuted in this trial or whether he has been or will be prosecuted.  Your duty is to decide

21  whether the People have proved the guilt of the defendant on trial."  CALJIC 2.11.5 (6th ed.).

22   That instruction was not given, but the standard instruction on reasonable doubt was given in

23  this case. The reasonable doubt instruction provides that a defendant is presumed innocent and

24  "in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict

25  of not guilty." CALJIC 2.90.

26      Graves has not suggested how it would have made any difference at his trial if the third

27  party liability instruction was given.  As the California Supreme Court noted, the instruction

28

"merely says the jury is not to speculate on whether someone else might or might not be prosecuted." People v. Farmer, 47 Cal. 3d 888, 918 (Cal. 1989), overruled on other grounds by People v. Waidla, 22 Cal. 4th 690 (Cal. 2000).  The instruction does not tell jurors that they can or cannot consider the evidence.  See id.  Graves' attorney did present evidence of third party liability in the form of William Barnhard's testimony and did argue extensively that Casteel, and perhaps Shivel, were the murderers.  See RT 1232, 1237, 1239, 1242, 1244, 1246.  Having the jury instructed with CALJIC 2.11.5 would have done nothing to aid the defense that Casteel committed the murder and therefore Graves did not.  Cf. People v. Earp, 20 Cal. 4th 826, 896 (Cal. 1999) (failure to instruct on third party liability harmless where jury was instructed with reasonable doubt instruction and defense counsel argued in closing that a third party committed the crime).  The point of trying to show that a third party has committed a crime is to raise reasonable doubt that the defendant on trial has committed the crime of which he is charged – a defendant has no duty to provide an alternative perpetrator to avoid conviction.  Here, the defense evidence that Casteel confessed to Barnhard was presented to try to raise reasonable doubt that it was Graves who had committed the murder.  The third party liability instruction would have done nothing that the evidence, closing argument, and CALJIC 2.90 had not accomplished already.

Graves also cannot show prejudice for the separate reason that the third party liability evidence was so weak.  Barnhard did testify that Casteel had confessed.  But Casteel got so many of the details wrong that no reasonable jury would have believed the confession.  Casteel was wrong about the location of the shooting in claiming it occurred in a bedroom, wrong about the time of the shooting in claiming that it occurred at night, wrong about the victim's race in claiming he was Caucasian, wrong about where the victim was shot in claiming he was shot twice in the head, and wrong in claiming that a pillow had been put between the victim and the gun when the shot was fired.  Not only were lots of details wrong, Barnhard had recently had ample opportunity to consult with Graves as they had been housed in the same jail module for several months, although he denied doing so.  Also, Barnhard admittedly had implicated Casteel

in hopes of helping his own case (when he was arrested for carjacking) and admittedly had current animosity toward Casteel. In sum, lots of the confession had incorrect details, and was testified to by a witness with some bias. There is no reasonable probability that the result would have been different if counsel had requested and the jury had received the instruction on third party liability. The claim that Graves' trial counsel was ineffective for not requesting the instruction fails.

L.     Claim 17: Appellate counsel failed to argue that the trial court
       gave an improper implied malice instruction.

Graves contends that appellate counsel was deficient in not arguing on appeal that the implied malice instruction was improper. For the reasons discussed in Section I (Claim 14) above, there is no merit to the contention that the instruction was infirm. The claim that appellate counsel was ineffective fails on both prongs of the Strickland test. That is, it was not deficient performance to not make a meritless argument in the appeal brief and no prejudice resulted from not making that meritless argument.[5]

M.     Claim 18: Appellate counsel failed to argue that trial court
       should have sua sponte instructed on third-party liability.

Graves contends that his appellate counsel was ineffective in failing to raise on appeal an argument that the trial court erred in failing to sua sponte instruct on third party liability. As explained in Section K (Claim 16) above, the pattern third party liability instruction would have done virtually nothing to help the defendant and the relevant principle was covered in the reasonable doubt instruction that was given. A criminal defendant is entitled to adequate

_____

[5]In addition to his challenge to the instruction as a misstatement of California law, Graves also urges that the instruction violated state separation of powers rules and was an unforeseeable judicial expansion of implied malice. The court need not consider whether it was deficient performance not to make these arguments because the failure to do so resulted in no prejudice. The fact that the victim was shot execution-style made it almost certain that the jury did not long ponder whether the act met the definition of implied malice or would have looked at it differently if it was instructed that the act had to be the result of an abandoned and malignant heart.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

instructions on the defense theory of the case, as long as some evidence supports it.  See Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999).  However, the defendant is not entitled to have jury instructed in his or her precise terms where the given instructions adequately embody the defense theory.  See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).  Here, the pattern reasonable doubt instruction adequately embodied the principle that the prosecutor has the burden to prove the defendant guilty beyond a reasonable doubt.  Additionally, even if there were instructional error, it must be established that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht, 507 U.S. at 637, before habeas relief may be granted.  No prejudice resulted from not giving the third party liability instruction because the instruction added virtually nothing to the defense case and the third party liability evidence was so weak.  Appellate counsel was not ineffective in failing to raise this meritless claim.

N.    Claim 19: Appellate counsel failed to argue that the trial court
      inadequately examined a key defense witness about his refusal to
      testify based upon his Fifth Amendment privilege against self-incrimination.

Graves contends that appellate counsel was deficient in not arguing on appeal that the trial court conducted an inadequate examination of a defense witness before allowing that witness to avoid testifying by invoking his Fifth Amendment privilege against self-incrimination. For the reasons discussed in Section H (Claim 13) above, that claim would have failed because any error was harmless.  The claim that appellate counsel was ineffective fails on both prongs of the Strickland test.  That is, it was not deficient performance to not make a meritless argument in the appeal brief and no prejudice resulted from not making that meritless argument.

O.    Claim 20: Prosecutorial Misconduct.

In this claim, Graves contends that prosecutor Mark Peterson committed prosecutorial misconduct when he threatened to charge defense witness John Hinkley with the homicide of Gary Tutt if Hinkley testified on Graves' behalf.  Third Amended Petition, p. 40.  According to

24

1   Graves, not only did the prosecutor not grant immunity to this witness, he actually scared the

2   witness away from testifying.  The purported evidentiary support for this claim is Exhibit L(1)

3   filed on September 17, 2001, and Exhibit A filed on July 1, 2005.  Exhibit L(1) is Hinkley's June

4   5, 1997 declaration, and Exhibit A is a memorandum from an investigator who spoke to Hinkley

5   in 2005.

6        The guiding Supreme Court cases are <u>Darden v. Wainwright</u>, 477 U.S. 168 (1986), a case

7   on prosecutorial misconduct in general and <u>Webb v. Texas</u>, 409 U.S. 95 (1972), a case on

8   judicial coercion of witnesses.  <u>Darden</u>, 477 U.S. at 181, stands for the proposition that a

9   defendant's due process rights are violated when a prosecutor's misconduct renders a trial

10  "fundamentally unfair."  <u>See also</u> <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone

11  of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial,

12  not the culpability of the prosecutor").  <u>Webb</u>, 409 U.S. at 98, stands for the proposition that due

13  process might be violated if a judge gives warnings that are so coercive or threatening that the

14  defendant is deprived of a key witness on his behalf.  <u>See</u> <u>id.</u> (in lengthy warning, trial judge

15  accused potential witness of planning to commit perjury and threatened to put him in jail for a

16  long time if he committed perjury).  However, due process is not offended when a judge merely

17  warns a defendant of the consequences of perjury, <u>United States v. Harlin</u>, 539 F.2d 679, 681

18  (9th Cir. 1976), or simply informs an unrepresented witness of his Fifth Amendment privilege,

19  <u>see</u> <u>United States v. Jackson</u>, 935 F.2d 832, 847 (7th Cir. 1991) (witness who may be asked to

20  provide self-incriminating testimony could be advised of the risks by prosecutor if advice is

21  presented in a manner calculated to engender informed and uncoerced decision making by

22  witness); <u>United States v. Schaflander</u>, 719 F.2d 1024, 1025-26 (9th Cir. 1983) (trial court's

23  colloquy with defendant to ensure that he understood the possible consequences of testifying was

24  permissible).  <u>Darden</u> and <u>Webb</u> can be read together to stand for the proposition that a

25  prosecutor threatening a witness so vigorously that he decides not to testify would violate due

26  process if it made the trial fundamentally unfair.  <u>See</u> <u>United States v. Vavages</u>, 151 F.3d 1185,

27  1189 (9th Cir. 1998) ("the conduct of prosecutors, like the conduct of judges, is unquestionably

28

governed by <u>Webb</u>.")

The problem with Graves' claim is that his evidence does not show what he needs, i.e., misconduct <u>by the prosecutor</u>.  Graves has lumped together the attorney who represented Hinkley with the District Attorney, but the evidence does not connect the two.

The record indicates that attorney Ken Dothee came to the courtroom at the trial judge's request to advise Hinkley on the Fifth Amendment question. <u>See</u> RT 1091.  A recess was taken, after which the judge stated that he had "asked Mr. Dothee to inquire of his client whether he was willing to testify and prepared to testify and whether we'd have any problems.  Mr. Dothee reported off the record to all concerned, he did have concerns about Mr. Hinkley.  Mr Hinkley had concerns."  RT 1092.  Hinkley then invoked his Fifth Amendment privilege against self incrimination.  The attorney, Ken Dothee, apparently was a defense attorney doing a quick stint as counsel for Hinkley limited to the Fifth Amendment question.[6]  There is no evidence that Dothee was a prosecutor.  It would be extremely unlikely that someone from a district attorney's office would ever be representing a potential criminal defendant to advise him to invoke his Fifth Amendment privilege against self-incrimination.  The record also does not indicate that Peterson had any conversation with Hinkley.  Prosecutor Peterson stated he had "never spoken to Mr. Hinkley at all."  RT 1108.  Neither Hinkley nor Dothee mentioned any comment by the court or by the prosecutor in connection with Hinkley invoking his privilege against self-incrimination.  There thus is no indication that Dothee's comments should be attributed to the prosecutor, Mark Peterson.

Graves' evidence about Hinkley shows that the alleged "threat" came from Dothee, and not from Peterson.  In his declaration made under oath on June 5, 1997, Hinkley clearly stated that his decision not to testify was based on statements by Dothee and not prosecutor Peterson.

---

[6]In the California State Bar's online records there is only one listing for an attorney named Dothee, and that is for Harry Kenneth Dothee, whose business address is the Contra Costa Public Defender's Office.

Hinkley declared:

> I was aware of certain facts about the murder that implicated someone other than David Graves, as the perpetrator of that crime. Had I been allowed to give this information to the jury, I definately would have done so. However, I was informed by Atty. Ken Dotae, before taking the stand that, If I testified in David's behalf . . . I would as a result . . . be charged with The Same Murder. . . I Thereafter, as a result of this threat, was forced to plead the Fifth and withdraw my intended testimony.

Pet. Exh. L(1), 6/5/97 Hinkley Decl. (errors and ellipses in original; emphasis added).  Gary Mosbarger, an acquaintance of Graves' father, also signed a declaration under penalty of perjury that he had met with Hinkley and helped with the statement just quoted.  Mosbarger declared:

> John [Hinkley] told us that he wanted to testify at the trial of David Graves, that Scott Casteel had confessed to him of killing Gary Tutt. [¶] Hinkley then stated that the attorney who was appointed to him by the court, informed him that if he were to testify to this fact (I.E. THE CONFESSION), the district attorney would charge him with the murder at hand. [¶] Mr. Hinkley then stated that he was then forced to plead the 5th Amendment out of fear of being charged himself with the same murder.

Pet. Exh. L(4), 1/1/2000 Mosbarger Decl.  (emphasis added).

Graves has submitted a newer piece of evidence in support of his claim, but this latest evidence also does not show that prosecutor Peterson threatened the witness and does not even rise to the level of requiring an evidentiary hearing on the matter.[7]  The evidence is a memorandum prepared by a private investigator, Bill Lewis, about his April 20, 2005 interview of John Hinkley, who was then in prison serving a 15-year sentence for an assault conviction. Lewis wrote that Hinkley told him that he was not present at the shooting, and heard about the shooting that day from Donny Shivel.  See Motion For Leave To File Third Amended Complaint Or To Reinstate Abeyance Of Proceedings (docket # 63), Exh. A (undated Bill Lewis

---

[7]Even assuming arguendo that Graves' failure to develop the factual basis for this claim in state court was through no fault of his, he would not be entitled to an evidentiary hearing in this court because he has not made out a prima facie or colorable claim for relief. See Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005); see also Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas "was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence'").  As mentioned in the text, the person who allegedly was "threatened" declared under oath that the threat-maker was the attorney who was appointed to represent him.  With that sworn statement as a background, Lewis' hearsay statement that Hinkley was threatened by the district attorney's "office" without identifying the person working in that office who uttered the "threat" does not make out a colorable claim of prosecutorial misconduct.  An evidentiary hearing is denied.

27

memorandum).  Hinkley told Lewis that he gave a statement to law enforcement officers at the time but it was limited to only third party information.  According to Lewis, Hinkley also stated that later, Scott Casteel confessed to him that he had shot Tutt.  Hinkley thought Casteel shot Tutt because Casteel thought Tutt was a "rat."  Id. at 2.  Lewis did not further elaborate on the confession.  Hinkley also told Lewis that thereafter he encountered Graves in jail and when Graves told him that he was in custody for shooting Tutt, Hinkley told Graves that Casteel had confessed to him that he (Casteel) shot Tutt.  Id. at 3.  Of importance to this claim are the following statements in Lewis' memorandum:

> Mr. Hinkley said the District Attorney's <u>office threatened him</u> if he testified to Casteel's confession.  He (Hinkley) said he would have been charged for accessory after the fact and would do 25 years to life if he testified to Scott Casteel's confession.  At that time Hinkley asserted his 5th amendment privilege.  Mr. Hinkley said he was released form his probation violation very soon after asserting this concession. [¶] Mr. Hinkley said that he "feels very badly" for David Graves but that he could not do a 25 to life sentence for his knowledge of Casteel's confession to killing Gary Tutt.  I asked Mr. Hinkley why he felt the District Attorney's <u>office</u> did not want him to testify.  Mr. Hinkley said he believed Scott Casteel was at the time a "confidential informant" for their drug enforcement task force.  He (Hinkley) believed this was the reason the District Attorney's <u>office</u> did not want him to testify.

Id. at 3 (emphasis added).  What is striking about Lewis' memorandum is that he does not identify who the actor was – obviously it would have to be a person and not an office that conveyed the "threat" to Hinkley.  Lewis' memorandum does not name any person in the district attorney's office who conveyed the "threat" and does not include any information about Hinkley retracting his earlier sworn statement that the person who conveyed the "threat" was attorney Ken Dothee, who was not the prosecutor.

In light of the fact that the alleged threat was made by an attorney who was not the prosecutor, this court need to inquire whether attorney Dothee's statements actually were threats or otherwise impermissibly coercive.  It is important to note this, as it is not at all clear that Graves would be able to establish an actual threat.  Counsel is appointed to represent a prospective witness with potential self-incrimination problems to explain the realities of self-incrimination to that witness – e.g., that he may be prosecuted based on his testimony in this case if he makes statements showing his involvement in this crime or even other crimes and that he

may be prosecuted for perjury if he lies in his testimony.  This eye-opening kind of advice may scare some clients but it is not inherently coercive or threatening. The reason the attorney has been appointed is to give a candid explanation of the facts and law related to the Fifth Amendment privilege issues.  The attorney advises on the law based on the facts known to the client, and the facts or hypotheticals divulged during that conversation may well affect how emphatic the attorney's advice is.

Finally, even if there had been a "threat" made by the prosecutor that caused Hinkley to elect not to testify, it would have been harmless error.  As respondent notes, the jury heard and rejected the defense theory that Casteel committed the murder.  Adding Hinkley's testimony that Casteel confessed to him to Barnhard's testimony of Casteel's elaborate but error-filled description of how he killed Tutt would not have made the confession any more believable.  The exclusion of his testimony did not have a substantial and injurious effect on the verdict.  Graves is not entitled to the writ on his prosecutorial misconduct claim.

P.    Miscellaneous motions

Respondent's motion to withdraw his supplemental answer is GRANTED.  (Docket # 137.)  Respondent explained in his motion that his argument in the supplemental answer that a claim was untimely was based on a factual error that petitioner pointed out in his reply, i.e., respondent had not included a particular habeas petition filed in the California Court of Appeal in making his calculations to argue that the claim was untimely.

Petitioner's motion for leave to file a supplemental traverse in excess of eight pages is GRANTED.  (Docket # 133.)  The court has considered both his reply (docket # 130) filed December 2, 2008, and his supplemental traverse (docket # 134) filed December 16, 2008.

Petitioner's motion to compel the court to file the second amended petition received on November 17, 2008 (docket # 121) is DENIED.  Petitioner did not comply with the court's order, which was to file a verification for the already-filed second amended petition, rather than a new second amended petition.  In any event, it turns out that there was a verification for the existing

second amended petition (docket # 62), but oddly was placed in the middle of that document (at page 4) rather than at the end of it.  The verification is in the file, so no further verification is needed from petitioner.

### CONCLUSION

All the claims have now been adjudicated against Graves.  The second amended and the third amended petitions for writ of habeas corpus are DENIED.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: May 26, 2009

_____
SUSAN ILLSTON
United States District Judge